**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WISCONSIN**

Civil File No.: 3:25-cv-653

BROCK MONTPETIT, AND ALL OTHERS SIMILARLY SITUATED,

Plaintiff,

v.

HOYT ARCHERY, INC.; ARCHERY TRADE ASSOCIATION, INC.; BOWTECH, INC.; BPS DIRECT, LLC D/B/A BASS PRO SHOPS; CABELA'S LLC; DICK'S SPORTING GOODS, INC.; JAY'S SPORTS, INC. D/B/A JAY'S SPORTING GOODS; KINSEY'S OUTDOORS, INC.; LANCASTER ARCHERY SUPPLY, INC.; MATHEWS ARCHERY, INC.; NEUINTEL, LLC D/B/A/ PRICESPIDER F/K/A ORIS INTELLIGENCE; PRECISION SHOOTING EQUIPMENT, INC.; TRACKSTREET, INC.,

Defendant.

**COMPLAINT**
**AND JURY DEMAND**

Plaintiff Brock Montpetit, on behalf of himself and all others similarly situated, brings this action seeking to recover overcharge damages on Archery Equipment resulting from an anticompetitive agreement between Defendants to artificially raise and maintain prices. Plaintiff makes the following allegations:

## INTRODUCTION

1. The global Archery Equipment market size was approximately $2.42 billion in 2023 and is expected to continue to grow rapidly as archery gains popularity as both a recreational activity and a competitive sport.

2. Advances in equipment technology have made archery more accessible and appealing to a broader audience, adding to the growth in the market.

3. As the market for Archery Equipment grows, manufacturers and certain retail outlets have, via the orchestration of the Archery Trade Association ("ATA"), colluded to implement and enforce minimum advertised pricing policies (MAPs) to create and maintain a supra-competitive price floor for all of their equipment.

## PARTIES

4. Plaintiff Brock Montpetit is a citizen of Wisconsin, who purchased one or more pieces of Archery Equipment that was manufactured by one or more of the Defendants. The Archery Equipment Plaintiff purchased was sold at artificially inflated prices due to the conduct of Defendants as alleged herein. Specifically, Plaintiff has purchased a bow and related components within the last two years and has purchased arrows and accessories within the last year from local Archery stores in both Wisconsin and Minnesota.

5. Defendant Hoyt Archery, Inc. ("Hoyt") is a Utah corporation with its primary place of business at 593 N Wright Brothers Drive, Salt Lake City, Utah. At all relevant times, Hoyt was a member of the ATA with a representative on its Board of Directors; sold Archery Equipment subject to a MAP; and engaged in the agreement to fix, raise, maintain, or stabilize prices of Archery Equipment sold in the United States.

6. Defendant Bowtech, Inc. ("Bowtech") is a Delaware corporation with its primary place of business at 90554 Highway 99 N, Eugene, Oregon. At all relevant times, Bowtech was a member of the ATA with a representative on its Board of Directors; sold Archery Equipment subject to a MAP under the "Bowtech," "Excalibur Crossbow," "Diamond Archery," "Stryker Crossbows," and "Octane Accessories" trade names; and engaged in the agreement to fix, raise, maintain, or stabilize prices of Archery Equipment sold in the United States alleged herein.

7. Defendant Mathews Archery, Inc. ("Mathews") is a Wisconsin corporation with its primary place of business at 919 River Road, Sparta, Wisconsin. At all relevant times, Mathews was a member of the ATA with a representative on its Board of Directors; sold Archery Equipment subject to a MAP; and engaged in the agreement to fix, raise, maintain, or stabilize prices of Archery Equipment sold in the United States.

8. Defendant Precision Shooting Equipment, Inc. ("PSE") is a Delaware corporation with its primary place of business at 2727 North Fairview Avenue, Tucson, Arizona. At all relevant times, PSE was a member of the ATA with a representative on its Board of Directors; sold Archery Equipment subject to a MAP; and engaged in the agreement to fix, raise, maintain, or stabilize prices of Archery Equipment sold in the United States. PSE is owned by Heritage Outdoor Group LLC.

9. Defendant Cabela's LLC ("Cabela's") is a Delaware limited liability company with its primary place of business at 1 Cabela Drive, Sidney, Nebraska. Cabela's has 171 retail locations throughout the United States, as well as an internet storefront. Until 2017, Cabela's was a member of the ATA with a representative on its Board of Directors; sold

Archery Equipment subject to a MAP; and engaged in the agreement to fix, raise, maintain, or stabilize prices of Archery Equipment sold in the United States. In 2017, Cabela's was acquired by Bass Pro Shops.

10. Defendant DICK'S Sporting Goods, Inc. ("Dick's") is a Delaware corporation with its primary place of business at 345 Court Street, Coraopolis, Pennsylvania. It has stores located throughout the United States, as well as an internet storefront. At all relevant times, Dick's was a member of the ATA; sold Archery Equipment subject to a MAP; and engaged in the agreement to fix, raise, maintain, or stabilize prices of Archery Equipment sold in the United States.

11. Defendant BPS Direct, LLC, d/b/a Bass Pro Shops ("Bass Pro Shops") is a Delaware corporation with its primary place of business at 2500 E Kearney Street, Springfield, Missouri. Bass Pro Shops has approximately 200 retail locations throughout the United States, as well as an internet storefront. At all relevant times, Bass Pro Shops was a member of the ATA; sold Archery Equipment subject to a MAP; and engaged in the agreement to fix, raise, maintain, or stabilize prices of Archery Equipment sold in the United States.

12. Defendant Jay's Sports, Inc. d/b/a Jay's Sporting Goods ("Jay's Sporting Goods") is a Michigan corporation with its primary place of business at 8800 S Clare Avenue, Clare, Michigan. Jay's Sporting Goods has two retail locations in Michigan and an internet storefront. At all relevant times, Jay's Sporting Goods was a member of the ATA with a representative on its Board of Directors; sold Archery Equipment subject to a

MAP; and engaged in the agreement to fix, raise, maintain, or stabilize prices of Archery Equipment sold in the United States.

13. Defendant Kinsey's Outdoors, Inc. ("Kinsey's") is a Pennsylvania corporation with its primary place of business at 1660 Steelway Drive, Mount Joy, Pennsylvania. Kinsey's distributes outdoor goods, including Archery Equipment, to more than 4,600 retailers across the United States, in addition to its own retail location and internet storefront. At all relevant times, Kinsey's was a member of the ATA with a representative on its Board of Directors; sold Archery Equipment subject to a MAP; and engaged in the agreement to fix, raise, maintain, or stabilize prices of Archery Equipment sold in the United States.

14. Defendant Lancaster Archery Supply, Inc. ("Lancaster") is a Pennsylvania corporation with its primary place of business at 2195A Old Philadelphia Pike, Lancaster, Pennsylvania. Lancaster describes itself as "a leading worldwide archery distributor" with its own retail location and internet storefront. At all relevant times, Lancaster was a member of the ATA with a representative on its Board of Directors; sold Archery Equipment subject to a MAP; and engaged in the agreement to fix, raise, maintain, or stabilize prices of Archery Equipment sold in the United States.

15. Defendant Archery Trade Association is a Virginia corporation with its primary place of business at 117 South Valley, New Ulm, Minnesota. The ATA is the trade association that represents the economic interests of corporations involved in the manufacture, wholesale, retail, sales, and distribution of Archery Equipment. According to the ATA, one of its primary purposes is to "maintain and enhance the profitability and

economic viability of individuals, companies and corporations in the archery industry." At all relevant times, the ATA engaged in the agreement to fix, raise, maintain, or stabilize prices of Archery Equipment sold in the United States.

16. Defendant TrackStreet, Inc. ("TrackStreet") is a Delaware corporation with its primary place of business at 9811 W Charleston Blvd, Suite 2-776, Las Vegas, Nevada. At all relevant times, TrackStreet provided Defendants with software to create, track, and enforce their MAP policies. In particular, TrackStreet provides brands with digital tools to track and enforce pricing policies such as MAP policies. Features include on-demand notifications of MAP violations and customizable messages to send to violators. In addition, TrackStreet also helps clients to formulate pricing policies, including MAP policies. At all relevant times, TrackStreet engaged in the agreement to fix, raise, maintain, or stabilize prices of Archery Equipment sold in the United States.

17. Defendant NeuIntel, LLC, d/b/a PriceSpider, f/k/a Oris Intelligence ("Oris"), is a California corporation with its primary place of business at 20 Pacifica, Suite 1000, Irvine, California. At all relevant times, Oris provided Defendants with software to create, track, and enforce their MAP policies. Oris touts its MAP monitoring solution, Prowl, as "the world's most advanced MAP monitoring software." Oris also advises on the content of MAP policies and provides MAP violation letter templates. At all relevant times, Oris engaged in the agreement to fix, raise, maintain, or stabilize prices of Archery Equipment sold in the United States.

## JURISDICTION AND VENUE

18. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d) because this is a class action involving common questions of law or fact in which the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; there are more than 100 members of the class; and at least one member of the class is a citizen of a state different from that of one of the Defendants.

19. This Court has personal jurisdiction over each of the Defendants under 15 U.S.C. § 22 because each Defendant: (a) transacted business in the United States, including in this District; (b) manufactured, sold, shipped, or delivered substantial amounts of product in the United States, including in this District; (c) has substantial contacts with the United States, including this District; and/or (d) engaged in anticompetitive conduct that had the direct, foreseeable, and intended effect of injuring the business or property of persons residing in, located in, or doing business in the United States, including in this District. Moreover, each of the Defendants, individually and collectively, purposefully directed their business activities toward, and had substantial contacts with, this jurisdiction.

20. Defendants, directly or through their agents, subsidiaries, affiliates, or parents, may be found in and transact business in the forum state.

21. Defendants, directly or through their agents, engage in interstate commerce in the production, distribution and/or sale of Archery Equipment.

22. Defendants, directly or through their agents, engaged in unlawful acts alleged herein, within this District and that had effects within this District.

23. Venue is proper in this Court under 28 U.S.C. § 1391, because during the relevant Class Period, at least one of the Defendants resides in this District, transacted

business in this District, and the trade and commerce described herein was and is carried out, in substantial part, in this District.

## FACTUAL BACKGROUND

### I. The Archery Equipment Market

24. Archery Equipment refers to products used by consumers for bowhunting or archery. For purposes of this action, Archery Equipment consists of five main product markets, submarkets, or cluster markets: (1) bows—including compound bows, recurve bows, longbows, and crossbows—and their components; (2) arrows (minus the arrowhead) and their components, including the shaft, fletching, and nock; (3) arrowheads (or arrowpoints) including broadheads and field points; (4) targets, including bag targets, foam targets, and 3D targets; and (5) accessories, such as bow cases, arrow quivers, sights and scopes, and stabilizers.

25. A national participation survey commissioned by the ATA revealed that, in the United States, 9.9 million people identify as bowhunters, 17.6 million people indicate they are recreational archers, and 5.4 million individuals are competitive archers.[1] Each of these activities requires the purchase of Archery Equipment.

26. In 2024, the global Archery Equipment market was estimated at approximately $4.16 billion with the United States comprising about 89% of the market.[2]

[1] https://archerytrade.org/get-the-industrys-latest-archery-and-bowhunting-data/
[2] https://www.imarcgroup.com/archery-equipment-market

The Archery Equipment market is predicted to reach $4.62 billion in 2025 and $5.99 billion in 2030.[3]

27. Archery Equipment is sold to consumers by retailers. The retailers obtain their Archery Equipment either directly from manufacturers or through distributors. The retailers fall into two main categories: (1) specialty sports stores – those stores catering specifically to the archery or hunting market; and (2) big box sporting goods stores – those stores offering equipment for a broad range of sporting activities. The big box sporting goods stores have a larger online presence as well.

28. There are approximately 6,000 retail outlets in the United States that sell Archery Equipment; of those about 1,500 are full-time archery-only retailers. The remaining 4,500 stores are a mix of sporting goods stores, online retailers, and other businesses that sell some Archery Equipment alongside other products.

29. Archery Equipment is expensive. According to a 2023 ATA report, only 7% of bows cost under $300, while 28% cost between $300-$600, 16% cost between $600-$900, 23% cost between $900-$1,200, and 19% cost more than $1,200. Profit margins for bows tend to be around 27% while profit margins for accessories are closer to 40%.[4]

30. For purposes of this matter, the relevant product market is the Archery Equipment market, and the relevant geographic market is the United States.

[3] https://www.mordorintelligence.com/industry-reports/archery-equipment-market
[4] https://archerytrade.org/ata-business-school-profit-margins-101-part-2/

31. Defendants conspired to raise prices on Archery Equipment by adopting, implementing and enforcing MAPs that impact millions of consumers across the United States.

32. At all relevant times, Defendants possessed market power at the manufacturing, distribution, and retail levels in the Archery Equipment supply chain in the United States. Market power at each level of the supply chain made possible a scheme to significantly raise prices above competitive levels without the risk of losing a proportional number of sales. With substantial market power at each level, consumers could not shift to other companies or products to defeat artificial price increases.

## II. The Archery Trade Association

33. The ATA is an industry trade association focused on the sports of archery and bowhunting. It allows for a few different membership types: “Retailers and Ranges;” “Manufacturers & Distributors;” and “Additional Membership Types.”[5] None of the membership types allow consumers to join. And the ATA does not list its members publicly.

34. ATA membership has risen from 505 members in 2000 to over 2,500 members in 2023. And there are significant incentives to join the ATA as membership allows access to member-only benefits like attending the ATA Trade Show, use of the ATA Connect online forum, and a Member Directory.

[5] https://membership.archerytrade.org/member-types/

35. The ATA reports that 80% of its members belong to businesses along the Archery Equipment supply chain, including manufacturers, distributors, and retailers. Thus, many of the ATA members are horizontal competitors in the Archery Equipment market.

36. Through ATA events, the members have ample opportunity to meet and discuss their shared financial interests. For example, the ATA's Board of Directors, its Retail Council, its annual Trade Show, and "ATA Connect" all provide regular opportunities to meet and discuss the implementation and enforcement of industry-wide MAPs on Archery Equipment.

37. The ATA's Board of Directors consists of individuals involved in the manufacturing and distributing, as well as the retailers of Archery Equipment. And, at all times relevant to this matter, there have been horizontal competitors on the Board of Directors from each level of the Archery Equipment market.

38. The ATA's Board of Directors "guides ATA actions and shapes the organization's policies and positions." At the direction and with the knowledge of its Board of Directors, the ATA has promulgated rules, guidelines, practices, and procedures that have substantially restrained retail price competition for Archery Equipment sold in the United States.

39. Members of ATA's Board of Directors have openly supported strict MAP enforcement, with one former member boasting about how seriously they take enforcing

their MAP guidelines and crediting that enforcement for his company's "really high" sales last year.[6]

40. Similar to the Board of Directors, the ATA formed a Retail Council, led by several individual Board members. The Retail Council was re-established in 2016 for the purpose of improving "the industry's archery and bowhunting markets."

41. The Retail Council meets regularly "to discuss pressing issues" and "all industry happenings." One of the regular topics at the Retail Council meetings is the MAP policies and the enforcement of them – with one of the ATA's directors going so far as to note that the MAP policies are "probably one of the most talked about topics in the archery industry."

42. Members of the Retail Council have supported MAP policies. In fact, one member explained that "manufacturers should create MAP policies, and retailers should honor them" because "every business in the industry must work together as a group to be productive and profitable, which includes strong MAP policies and procedures." With another Retail Council member warning that "disobeying MAP policies…can have big consequences."

43. Another opportunity for the competitors to meet and collude on the MAPs is at the annual trade shows that the ATA sponsors. ATA trade shows are well-attended by industry participants: at the 2016 ATA trade show every major bow manufacturer was present and there were 1,168 retail and distribution buying companies in attendance.

---

[6] https://archerytrade.org/effective-map-programs-mean-nonstop-enforcement/

44. MAP policies are openly discussed at ATA Trade Shows. At one ATA Trade Show, a leading archery company posted placards around its booth reminding retailers "that it aggressively enforces its MAP policies."[7]

45. In addition to opportunities to meet and discuss pricing and MAP enforcement at the Board of Directors and the trade show, the ATA created a web-forum for its members – which it referred to as ATA Connect. It describes this platform as a place that "helps you build peer connections and talk regularly with like-minded business owners."[8] All ATA members were able to use the forum to "share ideas, ask questions, and get business advice."[9] ATA Connect had two forum sharing options – one which was available to all members and one which was exclusive to ATA-member retailers.

## III. Defendants' Conspiracy

46. Defendants agreed, combined, or conspired to artificially raise, fix, maintain, or stabilize prices of Archery Equipment in the United States. To implement this unlawful scheme, the Manufacturer and Retailer Defendants – acting through and with the aid of ATA – agreed to implement and strictly enforce MAP policies for Archery Equipment. The intent and result of this conspiracy were inflated prices for Archery Equipment throughout the Class Period.

47. This conspiracy was borne from rising concern within the industry about increasing price competition and diminishing profit margins in the market for Archery Equipment. To address this concern, Defendants, via the connections made available by the

[7] https://archerytrade.org/effective-map-programs-mean-nonstop-enforcement/
[8] https://archerytrade.org/myata-member-dashboard-unlock-the-full-potential-of-your-ata-membership/
[9] *Id.*

ATA, ultimately agreed upon a common course of action to lessen retail price competition and subsequent profit diminishment on Archery Equipment – the adoption, implementation, and strict enforcement of MAPs.

48. The ATA heard these concerns within the industry and responded by taking an active role in the conspiracy facilitation. The ATA organized meetings and platforms for its members to discuss and develop strategies to combat price competition – ultimately agreeing on MAP implementation and enforcement.

49. The goal of Defendants' strategy was to artificially raise retail prices on all Archery Equipment throughout the country. They succeeded in that goal, and Plaintiff and Proposed Class paid the supra-competitive prices as a result.

50. Beginning by at least 2014, Defendants agreed, combined, or conspired to artificially inflate, fix, maintain, or otherwise stabilize Archery Equipment prices in the United States. To implement their unlawful contract, combination, or conspiracy, the Manufacturer and Retailer Defendants – acting through, in concert with, or with the aid of the ATA and other co-conspirators – agreed to implement and strictly enforce sale price floors for Archery Equipment, under the guise of MAP policies. As a direct and proximate result of Defendants' intentional conduct, Archery Equipment prices were artificially inflated to supra-competitive levels and Plaintiff was thereby injured.

51. Bass Pro Shops and Cabela's joined the ATA board in 2014. It was with their support that industry participants adopted and enforced MAP policies.

52. The ATA's position on MAPs was memorialized in a December 31, 2014, blog post by ATA CEO Jay McAninch, titled "MAP: United We Stand, Divided We Fall."

The blog highlighted that industry-wide adoption and enforcement were necessary for profitability, and McAninch urged other manufacturers and retailers to join forces and agree to the policies:

> Unfortunately, this unprecedented interest has increased competition so much that some companies ignore MAP (minimum advertised price) just to make a sale....
>
> MAP has been controversial largely because it's associated with price fixing, which means setting a minimum or maximum price for selling consumer goods. It's a complicated law, and recent Supreme Court decisions are causing ripples throughout lower courts and consumer-advocacy groups....
>
> I believe to deal with this MAP issue, our industry must hold an open, honest dialogue about it. Everyone must participate because if we don't address the damage to our business model, we risk losing in the long term the sustained growth we've enjoyed. Since this involves everyone the ATA is the right group to facilitate this discussion and provide the vehicle for the industry to unite behind constructive, positive changes.
>
> To ensure the industry addresses these issues, we've engaged the ATA Board of Directors, and the leader of [buying groups] ARRO [Archery Rancher and Retail Organization], NABA [National Archery Buyers Association], NBS [Nation's Best Sports] and Sports Inc. We've also included manufacturers and distributors who expressed interest in MAP. In the months ahead, we'll facilitate a dialogue that examines what our industry's business leaders think can and should be done about MAP. To that end, the ATA will offer our MAP policy as a template that companies can use as a tool if they take action.
>
> We can't solve industry problems until we involve everyone in a conversation that shares concerns and develops a course of action. This first step basically "turns on the lights" because it requires everyone to share what they think about this issue's impacts on our industry. Once we have a clear sense of what MAP is about for ATA members, we can start a process that deals with it.

53. The ATA's template MAP policy was designed for the purpose of "protect[ing] our companies from state and federal legal actions, while clearly informing other companies of their unilateral policy on product pricing." ATA also created a checklist of key considerations "for forming – and enforcing – a sound effective MAP policy."

54. The ATA held a seminar at its trade show about creating and enforcing MAP policies and went on to issue a newsletter following the seminar about MAP policies advising members who "want[ed] to control the minimum advertised price (MAP) and/or the minimum resale price (MRP) of their products," that they "must create [a] policy statement, issue it to all resellers, and then enforce it consistently and forcefully with no negotiation."

55. Recognizing the legal predicament, the ATA's newsletter in 2015 explained that "[t]he ATA cannot set or enforce MAP/MRP policies for the industry because it would violate antitrust laws. However, the ATA can provide help and information so individual manufacturers can craft their own policies, which the companies must then enforce themselves."

56. This newsletter also expanded on the sample MAP policy ATA offered in 2014 and then included a "three-step plan…to help ATA-member manufacturers and distributors adapt a sample policy for their own use."

57. Further, the ATA went on to publish an MAP resource library for its members, which provided template policies and additional resources for retailers and manufacturers.

58. The ATA's push for industry-wide adoption and enforcement worked. For example, Defendant Kinsey's announced an updated MAP policy in June 2015. In a corresponding press release, Defendant Kinsey's explained:

> MAP policies exist to benefit both retailers and manufacturers by elevating the perception of brand value, which leads to increased margins for retailers. Kinsey's stands behind manufacturers in their implementation of minimum advertised pricing to protect the interests of their brands, as well as margin integrity within the retail network.

59. But implementation of an MAP policy was not enough. Strict enforcement was necessary for the price floors to be effective because many product resellers purchase Archery Equipment from distributors or retailers (including the Retailer Defendants) as opposed to directly from the manufacturers. Kinsey's June 2015 press release further explained that, as part of its MAP policy updates, it would be policing the MAP policies of Archery Equipment manufacturers, such as TenPoint Crossbow Technologies. Indeed, TenPoint Vice President explained that "Kinsey's has done a great job of backing TenPoint's enforcement of its MAP policy, thus strengthening the TenPoint brand as well as helping the retailers maintain a solid profit margin. This MAP enforcement is important in order to keep the retailer base, and archery as a whole, healthy."

60. T.R.U. Ball Archery's ("TRU") MAP policy is the epitome of policing throughout the supply chain. TRU's MAP policy includes the following penalties for violations:

> **New MAP Violator**:

A warning will be issued. Violator will be evaluated in approximately two weeks to determine if they have raised prices to MAP levels.

**Repeat MAP Violator:**
First repeat infraction – Violators who have been notified that they are below MAP pricing within the last six months will be given a 48 hour warning to raise prices to MAP levels. Violators who have not raised prices to MAP levels after this time period will be placed on the T.R.U., Inc. Do Not Sell List, which asks each distributor to immediately block supply of product, for 30 days.

**Second Repeat Infraction**
Violators who have been listed on the T.R.U., Inc. Do Not Sell List within the last six months who knowingly lower their prices below MAP level for a second time will be placed on the T.R.U., Inc. Do Not Sell List, which asks each distributor to immediately block supply of product, for 60 days.

**Three or More Repeat Infraction**
Violators who have been listed on the T.R.U., Inc. Do Not Sell List within the last six months who knowingly lower their prices below MAP level for more than two times will be placed on the T.R.U., Inc. Do Not Sell List, which asks each distributor to immediately block supply of product, for the greater of 60 days or until prices have been raised to MAP levels for at least 30 days.

61. Distributors who sold TRU Archery Equipment to other resellers (e.g. Cabela's supplying a small pro shop), were subject to additional conditions and penalties:

**Distributor Violators:**
T.R.U., Inc. will be using contracts from around the United States to purchase products from sources who are known to be violating MAP levels.

**First Infraction**
Distributors who are found to supply a company that is currently on the T.R.U., Inc. Do Not Sell List will be added to the T.R.U., Inc. Do Not Sell List for 30 days.

**Second Infraction**

> Distributors who are found to supply a company that is currently on the T.R.U., Inc. Do Not Sell List will be added to the T.R.U., Inc. Do Not Sell List for 60 days.
>
> **Third Infraction**
> Distributors who are found to supply a company that is currently on the T.R.U., Inc. Do Not Sell List will be added to the T.R.U., Inc. Do Not Sell List indefinitely.

62. In a June 23, 2015, post on the industry forum *Archery Talk*, one retailer remarked, "My hope is that the ATA association [sic] is successful in establishing an industry wide rule set that will be enforced industry wide."

63. MAP policies and enforcement continued to gain acceptance throughout the industry for the next several years as it is discussed publicly and privately at the ATA.

64. In a 2016 article titled, "ATA Members Weigh in on MAP," the ATA reflected on its success in implementing MAP policies and highlighted its efforts thus far, stating, "More than one year later, there's still good news and bad. However, the ATA and its member companies have worked tirelessly to discuss, craft and enforce MAP policies that could help manufacturers, retailers and the industry."

65. This article included statements from several Archery Equipment suppliers, including Mike Ellig, the founder of Archery Equipment manufacturer Black Gold Inc. Mr. Ellig cited the pivotal role ATA's MAP policies and efforts had in inflating his company's margins:

> I was ready to charge ahead, but as a small-business owner, I didn't know where to start and I didn't have two months to create a policy from scratch. Jay [McAninch] connected me with the ATA's lawyers and provided resources I wouldn't have found otherwise out here in Bozeman, Montana.

> Black Gold's MAP policy has been in place about two years. Ellig said he notices more companies adhering to the MAP policy, and also has "cut off" people who wouldn't abide by it.

66. Ellig went on to explain that the implementation and enforcement of MAP policies would benefit the Archery Equipment suppliers as a whole via higher margins and encouraged others to embrace MAP policies even if they meant sacrificing profits in the short term. As provided in the article: "Enforcing MAP policies is up to every individual company," Ellig said. "It's a lot of extra effort. A lot of people will decide it's not worth the hassle because it's so much work. Some won't take time to do it, but the longer-term impact of doing it right is 10 times greater than the short-term impact of getting a sale for the archery industry."

67. An Archery Equipment retailer and member of buying group ARRO stated, "[w]e have to educate our dealers about holding to the MAP as much as they can...[o]therwise [violators will] destroy the brick-and-mortar stores." This same retailer went on to note two "MAP Issues": (1) "Many sellers dodge MAP by selling a product and offering a $50 coupon or gift card. They sell the product so low that other retailers can't compete;" and (2) "Some manufacturers take the time and trouble to create MAP policies only to find they can't enforce them. That's really disappointing."

68. These and other comments reveal the goal of Defendants MAP policies – to stifle competition and artificially raise prices at the expense of consumers. Moreso, the comments highlight the pivotal role the ATA plays in this conspiracy:

> "It will take the ATA's power to educate retailers and manufacturers about the importance of upholding MAP policies," Stubstad said. "The cost of business continues to rise. For business to survive, we can't give our products and services away. Manufacturers must approach this problem like its enforcement and be determined to enforce their policies."

69. TRU's Director of Operations, Ben Summers, and Vice Chairman of the ATA Board of Directors discussed MAP policies from the perspective of a "large manufacturer." Mr. Summers noted the primary difficulty with effectuating their scheme was that a lack of vigorous enforcement would give competitors the opportunity to "cheat" on the agreement and steal sales by offering consumers better prices on Archery Equipment. Mr. Summers explained, "[i]f I'm really good at keeping my products at the MAP price, and I have a competitor who isn't keeping a MAP policy, and their product costs less than mine, I can lose lots of sales."

70. Bruce Hudalla explained MAP and ATA's role from the perspective of a sales representative:

> MAP is a good thing for the archery industry...It keeps a level playing field and allows people to compete on product knowledge and customer service. As a sales rep, I support MAP because it maintains the value of products and allows my customers – retailers and manufacturers – to operate at profitable margins....
>
> ATA has done an excellent job getting all the main players from retailers to manufacturers to sales reps in the same room and presenting the facts and sample policies, [and that] [i]f you have a [MAP] policy, it must be enforced.

71. Jay Scholes, co-founder of the marketing firm, Outtech, noted "we're responsible for upholding our sport, for making sure our retailers make money, and ensuring manufacturers also make money. MAP is a good thing for our industry." Mr.

Scholes concluded, "[i]f we all believe we're in this business because we love the outdoors, we have a responsibility to uphold MAP to strengthen the industry."

72. Just like earlier trade shows, the 2016 ATA Trade Show featured a presentation on MAP policies by an Archery Equipment retailer, remarking that "many dealers might not know how to price certain products, but MAP helps them learn what profit margin they need to make their business survive," and "We have to educate our dealers about holding to the MAP as much as they can...[o]therwise [violators will] destroy the brick-and-mortar stores." Another attendee added that "[t]he archery industry is uniting as one, understanding we are all in this together, and that unity is ultimately what will help us grow."

73. Throughout 2016, ATA kept up the information and resources for "Members Interested in MAP Policies," including "ATA resources about creating a MAP policy for your employer." These resources were only available to "ATA members," and were included in the price of membership.

74. In May 2016, nearly 40 ATA Retail Council members met for a "strategic-planning" meeting, including Council Chairman Mark Copeland (Jay's Sporting Goods General Manager). An August 30, 2016 article by *Inside Archery* included reflections on this meeting from Mr. McAninch and Mr. Copeland. Mr. McAninch noted that, "Things are changing...It's clear from our strategic planning meeting that our industry understands that its success depends largely on the success of archery and bowhunting retailers. The ATA's Retail Council is rejuvenated, highly engaged and ready to help force a better future for everyone in our industry." Mr. Copeland emphasized the ATA

Retail Council's pivotal role for obtaining industry-wide agreements: "I keep hearing that retailers are the industry's backbone. I'm appealing to every archery retailer to use our backbone to step up and be part of the solution."

75. MAP adoption and enforcement continued into 2017 with an ATA article titled, "ATA Members Speak: Marketing, MAP, and What's Next," noted that MAP "enforcement is a hot topic these days," and asked, "What's your take on MAP and why?" One archer retailer responded:

> We appreciate MAP policies and the companies that enforce them. When a company competitor enforces a MAP policy, we can stay profitable without having the showroom for a competitor who wants to undercut pricing. We started to discontinue stocking manufacturers who do not have MAP policies and don't enforce them, and those who supply Amazon.

76. In July 2017, the ATA Board of Directors met at Hoyt headquarters and unanimously agreed to add an additional two seats for Archery Equipment buying groups, National Archery Buyers' Association ("NABA") and the Archery Range and Retailers Organization ("ARRO"). With these additions, ATA's Board of Directors now consisted of "three pro shops, two buying groups, one sales representative, two multi-channel retailers, and 12 archery and bowhunting manufacturers and distributors."

77. ARRO's executive secretary emphasized ATA's crucial role in "growing archery and bowhunting in recent years," as well as its significant efforts to help "retailers be more profitable." ARRO's executive secretary further explained that ARRO's goal with the board appointment was to strengthen the relationship and communication between ARRO, ATA, and manufacturers.

78. Shortly after the board meeting, the ATA published an article titled, "MAP: What is it? Why Does it Exist?" The article reiterated and expanded on ATA's long signaled position that the industry should adopt MAP policies and provide assurance to competitors that they will do the same. The article explained that MAP policies "level the playing field for all retailers and eliminate the 'race to the bottom' that would occur if retailers endlessly competed to reduce prices. The policies also help manufacturers protect their integrity, maintain their worth and stabilize their brand." The article also warned of the dangers price competition posed to Archery Equipment suppliers: "small-business owners with brick-and-mortar shops lose business because they can't compete with online markets where consumers can easily compare prices with their smartphone or desktop computer," and that "[e]ventually, the archery industry itself suffers, which has widespread impacts, built as it is on a foundation of manufacturers and retailers supporting hunting, conservation and recreational shooting."

79. The ATA went on to explain that "ATA members regularly weigh in on MAP, and the conversation continues. While the ATA works with manufacturers to establish and enforce good MAP policies, you can get involved in several ways."

80. The ATA outlined a list of actions members could implement to address price competition. First, ATA encouraged members to "[s]tart by following good MAP policies, which means those enforced by manufacturers." The ATA further encouraged members to call manufacturers that do not have or enforce MAP policies and "express your concerns. Encourage them to work with the ATA to develop a MAP policy or improve their current policy."

81. The ATA outlined a list of actions members could implement to address price competition. First, ATA encouraged members to "[s]tart by following good MAP policies, which means those enforced by manufacturers." The ATA further encouraged members to call manufacturers that do not have or enforce MAP policies and "express your concerns. Encourage them to work with the ATA to develop a MAP policy or improve their current policy."

82. The article also features a clear conspiracy signaling statement from Ryan Shutts, Cabela's Merchandising Director, and an ATA Retail Council member: "every business in the industry must work together as a group to be productive and profitable, which includes strong MAP policies and procedures."

83. The article also emphasized the inflated profits Archery Equipment suppliers could reap from consumers by collectively implementing and enforcing MAP policies:

> [MAP policies] help retailers stay in tune with the market and margin expectations. In other words, if you understand and follow a manufacturer's MAP policy, you'll be better positioned to make more money and run a successful business....
>
> If you follow MAP and work within that price structure...[t]hat puts you in a better position financially than cutting the cost of a product and disobeying MAP policies, which can have big consequences....
>
> When you're part of the solution, you'll make more money.

84. In October 2017, ATA rolled out additional MAP resources as part of its introduction of the "MAP Resource Library." The corresponding press release stated:

> ATA staff are compiling manufacturers' MAP policies and positing them in the Members-Only area of the ATA website. This MAP Resources Library helps retailers learn which manufacturers have MAP policies, and

> helps retailers to understand and comply with them. Several policies are already posted, and the ATA will add more as manufacturers provide them.
>
> If you're a manufacturer and need help monitoring how well retailers adhere to your MAP policy, the ATA can help you, too. MAP policies are only effective if they're enforced, but monitoring and enforcing them can be challenging. To help, ATA has secured special discounts with firms that monitor and enforce MAP policies. These discounts are available only to ATA-member manufacturers.
>
> The ATA has asked all ATA-member manufacturers to provide their policies so they can be included in the MAP Resource Library. If your company has a MAP policy, or if you have questions, contact Wesley Lang, ATA membership manager, at wendyland@archerytrade.org. To capitalize on these ATA-member benefits, join the Archery Trade Association today.

85. In addition to providing a central repository for MAP policies of all ATA members, the MAP Resource Library functioned as a conspiratorial hub where competitors functionally signed an agreement not to compete with one another on price for Archery Equipment. Absent an agreement or the ATA's facilitation, Archery Equipment suppliers could not institute price floors because they could not be certain – and in fact would otherwise expect in a competitive environment – that their competitors would not undercut their pricing and steal business. Compiling and publishing all ATA member MAP policies thereby ensured compliance: ATA members now had a complete list of "competitors" that would not compete on price.

86. Defendants TrackStreet and Oris offer digital platform programs that enable users to track and enforce pricing policies, including MAPs. The ATA secured special discounts with these companies for their members specifically looking to enforce MAPs.

87. In 2019, the ATA described TrackStreet and Oris as providing "'web-crawlers' and other high-tech software to scour the internet for MAP violators." The article further explained that TrackStreet and Oris "know how to find out who's violating [MAP], identify their fictitious names, and track them as they move around to undercut our members."

88. On information and belief, the services TrackStreet and Oris provided were not merely violator identification but also notices to MAP violators and tracking information on seller violations such as when and how often the seller engaged in MAP violations.

89. The cost of obtaining similar services can exceed $1,000 per month, and for mid-size companies can exceed $20,000 per year. Given the high price of services, Archery Equipment suppliers would otherwise have no reason to purchase these services unless they were of real value. Here, Oris and TrackStreet increased Defendants' profitability and offered a more efficient enforcement mechanism. If they did not, Archery Equipment suppliers would stop subscribing. Thus, the financial viability of TrackStreet and Oris is inextricably intertwined with the Archery Equipment industry. TrackStreet and Oris understood and profited from their role in the conspiracy, and as such, share in the antitrust liability with the other Defendants.

90. In addition to the MAP Resource Library, the ATA added (and since deleted) a webpage specifically for MAP policies. The webpage described how a MAP policy "ensures all retailers compete fairly and evenly on service instead of price." The

webpage also outlined ATA's position that "[r]etailers are responsible for knowing MAP policies and adhering to them."

91. In May 2018, the ATA Retail Council met near Alma, Wisconsin. This meeting included conversations about the topics they anticipated retailers to address on ATA connect. One of these topics included "Minimum advertised price policies."

92. Defendants had achieved wide-spread acceptance of MAP policies by at least 2019. As a direct and proximate result, Defendants were able to obtain significant profits from artificially inflated Archery Equipment prices – all at Plaintiff's expense. Indeed, in a 2019 ATA article, TRU's Ben Summers boasted the company's "'really high sales the past year" as a result of "good MAP policies and relentless enforcement." Similar to the TRU's MAP policy, Kinsey's described their 2019 MAP policy as follows: "When someone breaks the rules, they lose the ability to buy that product from us. They also can't buy it online or through the manufacturer because we work closely with our vendors to build a 'do-not-sell' list." Kinsey's further explained that "[i]f your company has fallen below MAP prices, you will be restricted from purchasing these products from Kinsey's South effective immediately."

93. To continue to reap the margins from artificially inflated Archery Equipment prices, ATA emphasized the need for constant policing of MAP policies and exposing and punishing retailers or distributors who attempt to compete on price. As ATA's Director of Industry Relations, Kury Smith explained, ensuring MAP policy compliance is "a constant whack-a-mole or cat-and-mouse game with people who just want to make a quick buck," and people "who aren't worried about long-term

profitability." Smith further stressed the need for concerted action: "The big thing will always be communication and teamwork," because "[e]nforcing MAP will never get easier. That's why it's so important for ATA members to work together as much as possible."

94. On March 20, 2019, Mr. Smith hosted TrackStreet's Ryan Erickson on ATA's podcast, "Beyond the Bow," in an episode titled, "MAP Policies and Enforcement." Mr. Erickson explained collective action was necessary for MAP policies to effectively inflate prices, noting that "nobody wants to be the first soldier through the way...they tend not to turn out too well...[but] as soon as a couple of big brands hop on, then all of a sudden that provides an umbrella coverage for the rest of the brands to move forward."

95. Defendants continued to use the ATA and other industry media to signal to the market and their co-conspirators the cause precluding competition and raising prices via MAP policies.

96. In 2020, ATA CEO Matt Kormann published a blog post titled "CEO Blog: Importance of MAP," writing:

> Buying habits have also changed for consumers and business owners. We can't turn back the clock and delete the internet – no matter how appealing that might sound, especially to parents. That evolution keeps MAP in a spotlight. With just a couple of taps on an iPhone we can pull up our competitors' retail pricing. For pro shops, that means it's easier to identify potential violations of MAP policies.
>
> The first reaction might seem obvious: Manufacturers with solid MAP policies should be out there policing their retail channels. The reality is more complex. Doing so takes time and resources during a stretch in our industry where both are running at premiums. It might be even more simple to assume every retailer should just follow those policies, but as

> long as we live in a free and competitive market, some business owners will make decisions others do not like.

97. The January 2020 edition of *Inside Archery* re-published previous quotes by Kinsey's Justin Gorman who explained Kinsey's extensive efforts to discipline violators: "When someone breaks the rules, they lose the ability to buy that product from us. They also can't buy it online or through the manufacturer because we work closely with vendors to build a 'do-not-sell' list." Mr. Gorman went on to explain that "Everyone needs to pull their own weight, but we are doing all we can to help protect the honest shops that don't violate MAP, which are the shops that actually get hurt when someone else breaks the rules."

98. Defendants continue to signal and otherwise reaffirm their commitment to the conspiracy. This has the effect of both enabling compliance by those already in agreement, as well as encouraging additional members to join. For example, in March 2020, PSE General Manager was quoted in an *Insider Archery* article stating, "[t]he industry is in a hard place, but we are not going to wait for anyone else to fix it for us. We are going to make it part of PSE's business strategy to drive improvement and fix everything we can. And we are doing all of this while fully acknowledging that if we are successful, then we are also benefiting our competitors."

99. In the December 2020 edition of *Inside Archery*, Performance Archery's Manager, Phaen Pittman, offered that the "purchasing side is where we put a major emphasis on who we do business with and why...We're constantly researching to find the best products, backed by companies with strong MAP policies and good dealer margins."

100. Beginning in 2021, the ATA even began erasing references to its central role in the conspiracy throughout its website. Further, the ATA even began publicly encouraging its members to call to discuss any MAP questions.

101. In 2022, the ATA launched a members-only ATA Retail Business Tracker Survey, which served as another mechanism for Defendants to engage in the clandestine sharing of competitive sensitive information.

102. A subsequent article published on the ATA's website and titled, "ATA Members Capitalize on Data Shared in ATA's Retail Trend Tracker Survey," outlined the process and goals of the survey and explained that it hopes its members would utilize the survey data to compare their businesses with competitors.

103. Another ATA article titled, "Download the Latest ATA Retail Trend Tracker Survey for Valuable Data about Market Trends," outlined just how detailed the data being offered is, and included: (1) the percentage of merchandise sales by product category, types of bows, price ranges of bows, customer experience level, and foot traffic; (2) seasonal questions regarding what's trending and what's not, business challenges and what customers are saying; and (3) which price range customers are gravitating toward, as well as the percentage of sales of each product type; bows, accessories, and services such as coaching or bow technician work. Indeed, the ATA itself declared that "[t]his data allows you to see how your shop compares to your peers."

104. Leaving no room for doubt, additional advertisements confirm that the ATA's intent behind releasing this type of data was reduced price competition. Indeed, the ATA completed a similar survey concerning ATA members' prices for repairs and

servicing of Archery Equipment and advertised it as a way for members to "compare your service and labor rates to industry averages so you can see how you stack up against your peers." An accompanying ATA article confirmed this is exactly how ATA members used the data: in response to the question "What do you charge for your services?" one member replied, "Not enough. I was happy to see the bow-tech price comparison chart at the ATA show this year, and have intended to analyze what we charge and restructure it." The article concluded with a signal to members not to "sell yourselves short" and to "price your work accordingly."

105. The Retail Business Tracker remained ATA member-exclusive until sometime in 2024. Until then, the survey compiled competitively sensitive information from ATA Board Members and distributed it to competing retailers, manufacturers, and distributors in the Archery Equipment business.

106. Until 2024, these reports were completely unavailable to consumers. Now, consumers and other non-members can gain access to this data, but they must pay between $200 to $500 per report. ATA members continue to receive these reports for free.

107. ATA continues to urge and signal competitor acceptance and strict MAP policy discipline. In an ATA article titled, "Effective MAP Programs Means Nonstop Enforcement," Patrick Durkin writes, "Companies with effective MAP programs set clear policies and enforce them as if they're hunting coyotes, which means the season never ends and the challenge never dies." Further signaling concerted action, Barb Terry, Customer Relations and Training Director at TenPoint Crossbow Technologies, said, "Smaller dealers can't compete with people who drop their prices below MAP. If

they notify us, we'll follow up on it. We don't want to see someone [competitors] take money out of our customers' pockets." The article further explained that the "ATA has supporting members who can automate [the process of finding violators] so it's not so labor-intensive for the manufacturers."

## IV. Defendants Conspiracy is a Success

108. Defendants' agreements to artificially raise, fix, maintain, or otherwise stabilize prices for Archery Equipment and to exchange competitively sensitive information regarding Archery Equipment has had the intended and foreseeable effect of artificially raising the prices Plaintiff and Class Members pay for Archery Equipment.

109. The Defendants' horizontal agreement between would-be competitors and vertical agreement up and down the supply chain to raise prices through the implementation and enforcement of MAP policies actually did raise prices with two mechanisms:

A. First, when MAP policies are adhered to by a large number of horizontal competitors, it eliminates the ability of these would-be competitors to publicly advertise lower prices and thus attract more customers (as it would in a competitive market). Irrespective of whether a retailer may ultimately offer below MAP pricing to an Archery Equipment consumer by different means, such as a coupon or discount, MAP policies prohibit the advertisement of this lower price. Therefore, there is no incentive for these would-be competitors to lower their prices when there is a slim chance the lower price will be recouped by a higher sales volume.

B. Second, even if some retailers do end up offering these discounts or coupons on MAP prices, the industry-wide adoption of one price set unilaterally by the specific manufacturer would operate to artificially inflate the "starting point" price from which any such discounts would be calculated. This means that the actual price of the Archery Equipment that would be discounted in some way from the MAP pricing will still most likely be higher than the would-be competitive price of this Archery Equipment by the design of Defendants' anticompetitive conduct and/or conspiracy.

110. The ATA itself continued to encourage its members (including Defendants) to adopt and strictly enforce the MAP policies set forth. The ATA largely contended that MAP policies ensure all retailers compete fairly and evenly on service instead of price.

111. Defendants' conspiracy to fix prices within the Archery Equipment industry has achieved its intended effects, and those effects are displayed through statements made by the ATA's members.

112. NABA, previously holding seats on the ATA's Board of Directors, stated that its members strive for a minimum of 40% profit based on the manufacturer's MAP.

113. Upon information and belief, another retailer detailed the effects of the de facto price floors by claiming that most "archery shops are in areas where bow pricing is highly competitive from shop to shop. We all want to get the sale, but fortunately manufacturers set MAP pricing on bows, which mostly prevents one shop from grossly undercutting another on pricing. That way, we all get a piece of the pie."

114. Similarly, Defendants' exchange of key information had the effect of harming competition within the Archery Equipment market. This information exchange eliminates competition by removing the veil between retailers on prices, supply, demand, inventory, and other key factors, which would normally force retailers to compete with one another by offering lower prices to make the sale, and that ultimately results in higher prices paid by Plaintiff and the Class Members.

## V. Relevant Market

115. To assess the competitive effects of Defendants' unlawful and anticompetitive conduct, a relevant market must be defined. This market is defined as the zone of competition among the agreeing rivals in which the agreement may affect competition. A relevant market also contains both a product dimension (i.e., the product market) and a geographic dimension (i.e., the geographic market). As outlined within the Class definitions, this case is concerned with the sale of Archery Equipment in the United States and its territories.

116. Here the product market is for Archery Equipment. As alleged herein, the MAP policies that were created and enforced by Defendants applied to all items and price points of all Archery Equipment.

117. The relevant geographic market here is the United States and its territories.

118. Defendants hold market power for all Archery Equipment. As alleged herein, Defendant Manufacturers are some of the most well-known brands throughout the entire geographic market or the Archery Equipment industry as a whole. Further, Plaintiff describes the power Defendant Manufacturers consistently held over the ATA,

while holding seats on the ATA Board of Directors and ATA Retail Council throughout the Class Periods, which only increased their influence over the Archery Equipment market.

119. Moreover, Defendant Retailers make up some of the largest sellers or suppliers of Archery Equipment in the entire geographic market. The conception of the conspiracy was in large part due to the appointment of Defendant Retailers Bass Pro Shops and Cabela's to the ATA's Board of Directors. As alleged herein, Defendant Retailers also had power over the ATA, by consistently holding seats on the ATA's Board of Directors and ATA Retail Council throughout the Class Periods, which only increased their influence over the Archery Equipment market.

120. One of – if not the only – way these Defendant Retailers could compete for consumer sales is through price, which is the exact component that Defendants all sought to fix through their conspiracy. Defendants' enforcement of MAP policies eliminates competition within the Archery Equipment industry and the "race to the bottom" that would occur had Defendants allowed themselves to participate in a legal, competitive market with one another.

121. Moreover, competition is harmed when would-be competitors collude and exchange key information such as financials, pricing, inventory, and sales strategies. When these items are shared amongst would-be competitors, any incentive to lower the price out of uncertainty of what the next manufacturer, distributor, or retailer will offer is diminished.

122. Defendants' exchange of key information did, in fact, harm competition. Through the platform and tools created, including but not limited to ATA Connect and the ATA Retail Growth Interact Channel, the ATA encouraged sharing ideas and asking questions amongst Defendants, including about buying patterns, profit margins, and what to charge for services. The ATA marketed these resources as ways to help address industry challenges, boost Defendants' bottom line, and promote archery and bowhunting.

123. Defendants then used this key information, which was learned through the various resources offered by ATA, to make the decision to create and enforce MAPs on the entire Archery Equipment market that they manufactured and supplied to consumers. Therefore, this knowledge eliminated any independent decision-making regarding the price and sales strategies offered by Defendants throughout the entire Archery Equipment market.

124. Defendants' exchange of key information through ATA channels, platforms, resources, events, Board of Directors, and Retail Council allows Defendants to collectively monitor each entity's sales, pricing, inventory, and other key items to ensure MAP policies are followed and everyone is upholding the agreed-upon conspiracy.

125. Further, where Defendants fix prices through MAP policies and restrict fair competition to service instead of price, the value of the key information exchanged through the ATA becomes exponentially more valuable.

126. Defendants' conspiracy to fix prices of Archery Equipment through the adoption, implementation, and enforcement of the industry-wide MAP policies by exchanging key information continues today. The ATA continues to endorse and

advocate for its members to develop a MAP policy, while also pushing for technology and software to track when such MAP policies are being violated. Thus, Defendants and their co-conspirators continue to express and signal to one another their continued commitment to the price-fixing agreement.

## VI. Statute of Limitations and Tolling

127. Generally, consumers are unaware of MAP strategies or how manufacturers, distributors, and/or retailers may set advertising and sales prices for each product offered. Consumers are equally unaware that as part of this MAP process, the Archery Industry has an entire association with over 1,000 industry player members that facilitates the collusion of these members in an effort to artificially raise and fix the prices that consumers pay.

128. Plaintiff had no actual or constructive knowledge of Defendants' anticompetitive scheme until, at the earliest, May 30, 2025, when the first class action complaint was filed against Manufacturers, Distributors, and Retailers, or the Archery Industry in *Santarlas v. Hoyt Archery, Inc., et al*, D. Utah 2:25-cv-00436-DAK. Before that, there was insufficient information available to Plaintiff to suggest that the Defendants had engaged in anticompetitive conduct to increase and maintain their Archery Equipment prices, and thus, he had no duty to inquire into the legality of the Defendants' conduct.

129. Moreover, even if Plaintiff had a duty to inquire before May 30, 2025, Plaintiff could not have discovered through the exercise of reasonable diligence the existence of Defendants' competitive scheme as alleged herein before that date.

130. Defendants' anticompetitive scheme was self-concealing in that Defendants did not allow consumers access to any insider data, insight, lessons, or other key information used to set MAP pricing and collude with other industry suppliers.

131. Plaintiff's and Class members' claims were tolled by the discovery rule, the continuing violations doctrine, and fraudulent concealment. Each purchase of Archery Equipment subject to MAP pricing is a new overt act causing injury to Plaintiff and the Classes.

## VII. Class Allegations

132. Plaintiff brings this action on behalf of himself, and as a class action under the Federal Rules of Civil Procedure 23(a) and (b)(2), as a representative of a Class of indirect purchasers seeking injunctive relief defined as follows:

> Any person in the United States who indirectly purchased Archery Equipment from the named Defendants, any Archery Trade Association member, or any of their coconspirators at any time between January 1, 2014, and the present (the "Class Period").

133. Plaintiff brings this action individually, and on behalf of all others similarly situated, under Federal Rules of Civil Procedure 23(a), 23(b)(3), and/or 23(c)(4) as representative of a Class seeking damages for violations of various state antitrust and consumer protection laws ("State Law Damages Class"), defined as:

> Any person in the United States who indirectly purchased Archery Equipment from the named Defendants, any Archery Trade Association member, or any of their coconspirators in Arizona, California, Colorado, District of Columbia, Florida, Hawaii, Idaho, Illinois, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina,

South Dakota, Tennessee, Utah, Vermont, West Virgina, and Wisconsin.[10]

134. The Classes are so numerous that joiner of all members would be impracticable. While the exact number of Class members is unknown, given the commerce at issue, there are likely thousands of Class Members.

135. Plaintiff's claims are typical of those of the Classes.

136. Plaintiff will fairly and adequately protect and represent the interests of the Classes. The interests of the Plaintiff are in accordance with those of the Classes.

137. Questions of law and fact common to the members of the Classes will prevail over individual questions because Defendants have acted on grounds generally applicable to the Classes.

138. Questions of law and fact common to the Classes include, but are not limited to:

a. Whether Defendants and co-conspirators intentionally and unlawfully impaired or impeded competition in the relevant market;

b. Whether Defendants and co-conspirators engaged in a contract, combination, and/or conspiracy to fix, raise, maintain, or stabilize prices of Archery Equipment sold in the United States;

---

[10] Direct purchases from any Defendant are excluded from the proposed Classes. Also excluded from the Classes are Defendants, their parent companies, subsidiaries and affiliates, officers, executives, and employees; Defendants' attorneys in this case; federal government entities and instrumentalities, states or their subdivisions; and all judges assigned to this case.

For purposes of defining the Class Period for the State Law Damages Class, the Class Period will extend back to the relevant statutes of limitation for the respective state claim.

c. Whether Defendants' and co-conspirators' conduct caused the prices of Archery Equipment sold in the United States to be sold at artificially high and supra-competitive levels;

d. Whether the Plaintiff and other members of the Classes were injured by Defendants' and co-conspirators' conduct and, if so, the appropriate class-wide measure of damages for Class members;

e. The scope of any injunctive relief to which Plaintiff and the other members of the Classes are entitled; and

f. The proper measure of Damages.

139. Class action treatment is superior to individual actions and the fair and efficient adjudication of the controversy, because such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the need for unnecessary duplicative efforts and expenses. The benefits of proceeding as a class action, including providing injured persons with a method for obtaining relief for claims that might not be practicable to pursue individually substantially outweighs any difficulties that may arise in connection with managing this class action.

140. Plaintiff is not aware of any difficulties in the maintenance of this action as a class action.

141. The prosecution of separate actions by individual members of the classes would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

142. Plaintiff brings the action on behalf of all persons similarly situated pursuant to Rule 23, on behalf of all persons and entities that, as residents of various states, indirectly purchased Archery Equipment from a Defendant in the Class Period.

## VIII. Antitrust Injury

143. Defendants' anticompetitive conduct had the following effects, among others:

a. Price competition has been restrained or eliminated with respect to Archery Equipment;

b. The prices of Archery Equipment have been fixed, raised, stabilized, or maintained at artificially inflated levels;

c. Indirect purchasers of Archery Equipment have been deprived of free and open competition; and

d. Consumers of Archery Equipment, who indirectly purchased their equipment for personal use, paid artificially inflated prices.

144. The Archery Equipment that Plaintiff and class members purchased was in substantially the same form as when they were initially sold by Defendants. As a result, the Archery Equipment follows a traceable physical chain from Defendants to Plaintiff and Class Members, and overcharges on Archery Equipment can be traced from Defendants to Plaintiff and Class Members.

145. The purpose of the conspiratorial conduct of Defendants was to raise, fix, or maintain the price of Archery Equipment and, as a direct and foreseeable result,

Plaintiff and the Class Members paid supra-competitive prices for Archery Equipment during the Class Period.

146. Plaintiff and the Class Members have sustained injury to their property and suffered damages by having paid higher prices for Archery Equipment than they would have absent the Defendants' illegal, anticompetitive conduct.

147. This is an injury of the type that antitrust laws were meant to punish and prevent.

## COUNT I: INJUNCTIVE RELIEF
**Violation of the Sherman Act**
**(On behalf of Nationwide Class for Injunctive and Equitable Relief)**
**(All Defendants)**

148. Plaintiff incorporates each prior paragraph as set forth herein.

149. The relevant product market is the Archery Equipment Market.

150. The relevant geographic market is the United States.

151. Beginning as early as January 1, 2014, and continuing to the present, Defendants entered into an unlawful and continuing contract, combination, or conspiracy in unreasonable restraint of trade to artificially raise, fix, maintain, or stabilize prices for Archery Equipment in the United States to supra-competitive levels in violation of Sections 1 and 3 of the Sherman Act.

152. Defendants agreed between and among themselves to exchange competitively sensitive information, such as prices, output, supplies, costs, and purchasing and sales strategies.

153. Defendants' exchange of information has had the intended anticompetitive effects, including but not limited to: (1) raising, fixing, maintaining, or stabilizing prices of Archery Equipment at an artificially high level; and (2) eliminating or suppressing, to a substantial degree, competition among the Defendant Manufacturers and/or Retailers for sales of Archery Equipment in the relevant geographic market of the United States.

154. Each named Defendant has participated in one or more overt acts on information and belief in furtherance of the exchange of information.

155. Defendants' conduct is unlawful under the per se standard, while also being unlawful under the rule of reason analysis. Defendants' agreement is factually anticompetitive with no valid procompetitive justification. Moreover, even if there were valid procompetitive justifications, such justifications would have been reasonably achieved through less restrictive means of competition.

156. As a direct and proximate result of Defendants' contract, combination, and/or conspiracy alleged herein, the following effects have occurred, among others:

a. Price competition has been restrained, suppressed and/or eliminated within the United States for the sale of Archery Equipment;

b. Prices for Archery Equipment sold by Defendant Manufacturers and/or Retailers have been raised, fixed, maintained, or stabilized at artificially high, non-competitive levels throughout the United States; and

c. Those who purchased Archery Equipment indirectly from Defendant Manufacturers and/or Retailers, have been deprived of the benefits of free and open competition.

157. Plaintiff and Class members have been injured and will continue to be injured in their businesses and property by paying more for Archery Equipment purchased from Defendant Manufacturers and/or Retailers or their co-conspirators than they would have paid and will pay in the absence of the contract, combination, or conspiracy.

158. Plaintiff and the Class are threatened with future injury to their property unless Defendants are enjoined from further unlawful conduct.

159. Plaintiffs accordingly seek equitable and injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable laws to correct for the anticompetitive market effects caused by Defendants' unlawful conduct and to assure that similar anticompetitive conduct and effects do not continue or reoccur in the future.

## COUNT II
## Violations of State Antitrust Laws
## (All Defendants)

160. Plaintiff incorporates each prior paragraph as set forth herein.

161. Beginning as early as 2014 and continuing through to the present, Defendants have entered into an unlawful and continuing contract, combination, or conspiracy in unreasonable restraint of trade to artificially raise, fix, maintain, or stabilize prices for Archery Equipment in the United States to supra-competitive levels in violation of the state antitrust laws incorporated below.

162. Defendants agreed between and among themselves to exchange competitively sensitive information such as prices, output, supplies, costs, and purchasing and sales strategies.

163. Defendants' exchange of information has had the intended anticompetitive effects, including but not limited to: (1) raising, fixing, maintaining, or stabilizing prices of Archery Equipment at an artificially high level; and (2) eliminating or suppressing, to a substantial degree, competition among the Defendants for sales of Archery Equipment in the relevant geographic market in the United States.

164. By engaging in the foregoing conduct, Defendant intentionally and wrongfully engaged in conduct, a combination, or conspiracy in restraint of trade in violation of the following state antitrust laws:

a. Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade with respect to indirect purchases of Archery Equipment in violation of Ariz. Rev. Stat. §§ 44-1401 *et. seq*. by Class Members and/or Arizona residents.

b. Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade with respect to indirect purchases of Archery Equipment in violation of Cal. Bus. & Prof. Code §§ 16700, et. seq. by Class Members and/or California residents.

c. Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade with respect to

indirect purchases of Archery Equipment in violation of D.C. Code §§28-4501, *et. seq.*, by Class Members or District of Columbia residents.

d. Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade with respect to indirect purchases of Archery Equipment in violation of Haw. Rev. Stat. §§ 480-1, *et. seq.*, by Class Members or Hawaii residents.

e. Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade with respect to indirect purchases of Archery Equipment in violation of 740 Ill. Comp. Stat. Ann., *et. seq.*, by Class Members or Illinois residents.

f. Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade with respect to indirect purchases of Archery Equipment in violation of Iowa Code §§ 553.1, *et. seq.*, by Class Members or Iowa residents.

g. Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade with respect to indirect purchases of Archery Equipment in violation of Kan. Stat. Ann. §§ 50-101, *et. seq.*, by Class Members or Kansas residents.

h. Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade with respect to indirect purchases of Archery Equipment in violation of Me. Rev.

Stat. Ann. Tit. 10§§ 1101, *et. seq.*, by Class Members or Maine residents.

i. Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade with respect to indirect purchases of Archery Equipment in violation of Mich. Comp. Laws §§ 445.772, *et. seq.*, by Class Members or Michigan residents.

j. Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade with respect to indirect purchases of Archery Equipment in violation of Minn. Stat. §§ 325D.49, *et. seq.*, by Class Members or Minnesota residents.

k. Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade with respect to indirect purchases of Archery Equipment in violation of Miss. Code Ann. §§ 75-21-1, *et. seq.*, by Class Members or Mississippi residents.

l. Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade with respect to indirect purchases of Archery Equipment in violation of Neb. Rev. Stat. §§ 59-801, *et. seq.*, by Class Members or Nebraska residents.

m. Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade with respect to indirect purchases of Archery Equipment in violation of Nev. Rev.

Stat. Ann. §§ 598A.010, *et. seq.*, by Class Members or Nevada residents.

n. Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade with respect to indirect purchases of Archery Equipment in violation of N.H. Rev. Stat. Ann. Tit. XXXI, §§ 356, *et. seq.*, by Class Members or New Hampshire residents.

o. Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade with respect to indirect purchases of Archery Equipment in violation of N.M. Stat. Ann. §§ 57-1-1, *et. seq.*, by Class Members or New Mexico residents.

p. Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade with respect to indirect purchases of Archery Equipment in violation of N.Y. Gen. Bus. Law §§ 340, *et. seq.*, by Class Members or New York residents.

q. Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade with respect to indirect purchases of Archery Equipment in violation of N.C. Gen. Stat. §§ 75-1, *et. seq.*, by Class Members or North Carolina residents.

r. Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade with respect to

indirect purchases of Archery Equipment in violation of N.D. Cent. Code §51-08.1, *et. seq.*, by Class Members or North Dakota residents.

s. Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade with respect to indirect purchases of Archery Equipment in violation of Or. Rev. Stat. §§ 646.705, *et. seq.*, by Class Members or Oregon residents.

t. Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade with respect to indirect purchases of Archery Equipment in violation of R.I. Gen. Laws §§ 6-36-1, *et. seq.*, by Class Members or Rhode Island residents.

u. Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade with respect to indirect purchases of Archery Equipment in violation of S.D. Codified Laws §§ 37-1-3.1, *et. seq.*, by Class Members or South Dakota residents.

v. Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade with respect to indirect purchases of Archery Equipment in violation of Utah Code Ann. §§ 76-15-5, *et. seq.*, by Class Members or Utah residents.

w. Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade with respect to

indirect purchases of Archery Equipment in violation of W. Va. Code §§ 47-18-1, *et. seq.*, by Class Members or West Virginia residents.

x. Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade with respect to indirect purchases of Archery Equipment in violation of Wis. Stat. §§ 133.01, *et. seq.*, by Class Members or Wisconsin residents.

165. Plaintiff and Class Members are entitled to recover damages as permitted by law for their injuries caused by Defendants' violations of the respective statutes.

**<u>COUNT III</u>**
**Violations of Consumer Protection and Deceptive Trade Practices State Statutes**
**(All Defendants)**

166. Plaintiff incorporates each prior paragraph as set forth herein.

167. Defendants engaged in unfair competition or unfair acts or unconscionable acts or practices in violation of the state consumer protection statutes listed below.

168. By engaging in the unfair and unlawful conduct alleged in this Complaint, Defendants violated the following state consumer protection laws:

a. Defendants have engaged in unfair competition or unfair acts in violation of Ala. Code §§ 8-19-10, *et. seq.*

b. Defendants have engaged in unfair competition or unfair acts in violation of Ark. Code §§ 4-88-101, et. seq.

c. Defendants have engaged in unfair competition or unfair acts in violation of Cal. Bus. & Prof. Code §§ 17200, *et. seq.*

d. Defendants have engaged in unfair competition or unfair acts in violation of Colo. Rev. Stat. §§ *et. seq.*

e. Defendants have engaged in unfair competition or unfair acts in violation of D.C. Code §§ 28-3901, *et. seq.*

f. Defendants have engaged in unfair competition or unfair acts in violation of Fla. Stat. §§ 501.201, *et. seq.*

g. Defendants have engaged in unfair competition or unfair acts in violation of Haw. Rev. Stat. §§ 481-1, *et. seq.*

h. Defendants have engaged in unfair competition or unfair acts in violation of Idaho Code Ann. §§ 48-601, *et. seq.*

i. Defendants have engaged in unfair competition or unfair acts in violation of 815 Ill. Comp. Stat. Ann. §§ 505/1, *et. seq.*

j. Defendants have engaged in unfair competition or unfair acts in violation of Kan. Stat. Ann. §§ 50-623, *et. seq.*

k. Defendants have engaged in unfair competition or unfair acts in violation of Me. Stat. Tit. §§ 205-A, *et. seq.*

l. Defendants have engaged in unfair competition or unfair acts in violation of Mass. Gen. Laws Ch. 93A §§ 1, *et. seq.*

m. Defendants have engaged in unfair competition or unfair acts in violation of Minn. Stat. §§ 325F.68, *et. seq.*

n. Defendants have engaged in unfair competition or unfair acts in violation of Mo. Rev. Stat. §§ 407.010, *et. seq.*

o. Defendants have engaged in unfair competition or unfair acts in violation of Mont. Code §§ 30-14-103, *et. seq.*

p. Defendants have engaged in unfair competition or unfair acts in violation of Neb. Rev. Stat. §§ 59-1602, *et. seq.*

q. Defendants have engaged in unfair competition or unfair acts in violation of Nev. Re. Stat. §§ 598.0903, *et. seq.*

r. Defendants have engaged in unfair competition or unfair acts in violation of N. M. Stat. Ann. §§ 57-12-1, *et. seq.*

s. Defendants have engaged in unfair competition or unfair acts in violation of N.Y. Gen. Bus. Law §§ 349, *et. seq.*

t. Defendants have engaged in unfair competition or unfair acts in violation of N.C. Gen. Stat. §§ 75-1.1, *et. seq.*

u. Defendants have engaged in unfair competition or unfair acts in violation of N.D. Cent. Code §§ 51-10, *et. seq.*

v. Defendants have engaged in unfair competition or unfair acts in violation of R.I. Gen. Laws §§ 6-13.1-1, *et. seq.*

w. Defendants have engaged in unfair competition or unfair acts in violation of S.C. Code Ann. §§ 39-5-10, *et. seq.*

x. Defendants have engaged in unfair competition or unfair acts in violation of Tenn. Code. Ann. §§ 47-18-101, *et. seq.*

y. Defendants have engaged in unfair competition or unfair acts in violation of Utah Code Ann. §§ 13-11-1, *et. seq.*

z. Defendants have engaged in unfair competition or unfair acts in violation of Vt. Stat. Ann. Tit. 9, §§ 2453, *et. seq.*

aa. Defendants have engaged in unfair competition or unfair acts in violation of W. Va. Code §§ 46A-6-101, *et. seq.*

bb. Defendants have engaged in unfair competition or unfair acts in violation of Wis. Stat. §§ 100.20, *et. seq.*

169. On behalf of himself and the State Law Damages Class, Plaintiff sees all appropriate relief provided for under the above-described statutes.

## DEMAND FOR A JURY TRIAL

Plaintiff requests a trial by jury of all issues so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff requests judgment against Defendants as follows:

1. This action may proceed as a class action, with Plaintiff as the designated Class Representative and his counsel as Class Counsel;

2. Defendants have engaged in a contract, combination, and conspiracy in violation of Federal and State laws, and that Plaintiff and the Class Members have been injured in their business and property as a result of Defendants' violations;

3. Plaintiff and Class Members may recover damages sustained by them, as provided by the applicable state antitrust and trade practice laws, and that a judgment in favor of Plaintiff and the Class Members be entered against Defendants in an amount to be trebled to the extent such trebling is permitted pursuant to such laws;

4. Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on their behalf be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy, or agreement alleged herein;

5. Plaintiff and the Class Members be awarded pre-judgment and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

6. Plaintiff and the Class Members recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

7. Plaintiff and the Class Members receive such other or further relief as may be just and proper.

Respectfully submitted,

**BASSFORD REMELE**
***A Professional Association***

Dated: August 5, 2025

By: */s/ Jeffrey D. Klobucar*
Jeffrey D. Klobucar (WI #1107840)
Amanda M. Williams (MN #0341691)
100 South Fifth Street, Suite 1500
Minneapolis, MN 55402
Telephone: (612) 333-3000
Facsimile: (612) 333-8829
Email: awilliams@bassford.com

***Attorneys for Plaintiff and the Indirect Purchaser Class***